## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KATHY DENISE SNIDER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 19-1907-MN-SRF |
| | ) |
| ANDREW SAUL, | ) |
| Commissioner of Social Security | ) |
| | ) |
| Defendant, | ) |
| | ) |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Plaintiff Kathy Denise Snider ("Snider") filed this action on October 8, 2019 against the

defendant Andrew Saul, the Commissioner of the Social Security Administration (the

"Commissioner"). (D.I. 1) Snider seeks judicial review pursuant to 42 U.S.C. § 405(g) of the

Commissioner's August 20, 2018 final decision, denying Snider's claim for disability insurance

benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434.

The court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). Currently before the

court are cross-motions for summary judgment filed by Snider and the Commissioner.[1]  (D.I. 14;

D.I. 17) Snider asks the court to reverse the Commissioner's decision and remand with

instructions to award benefits or, in the alternative, remand for further proceedings. (D.I. 14;

D.I. 15 at 23) The Commissioner requests that the court affirm the ALJ's decision. (D.I. 17;

D.I. 18 at 24) For the reasons set forth below, recommends GRANTING Snider's motion for

---

[1] The briefing for the present motions is as follows: Snider's opening brief (D.I. 15), the
Commissioner's combined opening brief in support of his motion for summary judgment and
answering brief in opposition to Snider's motion (D.I. 18), and Snider's reply brief (D.I. 20).

summary judgment (D.I. 14), and DENYING the Commissioner's cross-motion for summary judgment (D.I. 17).

## II.      BACKGROUND

### A. Procedural History

Snider filed a DIB application on February 16, 2016.[2] (D.I. 8 at 170–71) In her DIB application, Snider claimed a disability onset date of July 31, 2015. (*Id.* at 170) Her claims were initially denied on June 30, 2016, and denied again after reconsideration on November 23, 2016. (*Id.* at 51–72, 102–05, 109–13) Snider then filed a request for a hearing, which occurred on June 18, 2018. (*Id.* at 115–16, 133–38) On August 20, 2018, Administrative Law Judge Jack Penca (the "ALJ") issued an unfavorable decision, finding that Snider was not disabled under the Act because she retained the residual functional capacity ("RFC") to perform her past relevant work as a medical receptionist and a fraud investigator, occupations which are semi-skilled and skilled, respectively, and sedentary. (*Id.* at 10–20, 69–70) The Appeals Council subsequently denied Snider's request for review on May 31, 2019, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 1–26) On October 8, 2019, Snider brought a civil action in this court challenging the ALJ's decision. (D.I. 1) On November 25, 2020, Snider filed a motion for summary judgment, and on January 21, 2021, the Commissioner filed a cross-motion for summary judgment. (D.I. 14; D.I. 17)

### B. Medical History

At the time of the ALJ's decision, Snider was sixty years old. (D.I. 8 at 101) Snider has a high school education and previously worked as a receptionist in a medical office and a fraud

---

[2] The ALJ noted that Snider filed this application on February 12, 2016, but the application is dated February 16, 2016. (D.I. 8 at 10, 170–71)

investigator. (*Id.* at 228) The ALJ found that Snider has the following severe impairments: degenerative disc disease, rheumatoid arthritis, stiff person syndrome, asthma, and obesity. (*Id.* at 13)

## 1. Rheumatology

On July 31, 2015, Snider consulted with Sheerin Javed, M.D. ("Dr. Javed"). (*Id.* at 332–35) Snider reported having lower back pain, joint stiffness in her left ankle and in her hands, and swelling in her ankles. (*Id.* at 332) In examining Snider, Dr. Javed observed decreased range of motion, trapezius tightness, loss of lordosis, synovitis across the knuckles, tenderness on palpation of the para spinal region and ankles, hallux valgus deformities, and metatarsal head tenderness with soft tissue swelling. (*Id.* at 333) Dr. Javed prescribed prednisone and methotrexate. (*Id.*)

In February and March 2016, Snider was treated by Maged I. Hosny, M.D. ("Dr. Hosny"), a rheumatologist. (*Id.* at 341–44) Dr. Hosny observed tenderness and swelling in Snider's hands, swelling in her feet, and tenderness in her lumbar spine. (*Id.* at 341) Dr. Hosny prescribed Naprosyn and instructed Snider to continue to take methotrexate. (*Id.*) Dr. Hosny also ordered several labs, X-rays of Snider's hands and feet, and made a referral for physical therapy. (*Id.* at 342) In a follow up visit with Dr. Hosny, Snider reported continued pain in her hands, feet, and lower back, and had discontinued methotrexate because it made her ill. (*Id.* at 343) Dr. Hosny observed tenderness in Snider's hands, knees, and feet and swelling in her hands and knees. (*Id.* at 344) Dr. Hosny prescribed hydroxychloroquine and ordered Snider to continue Naprosyn and prednisone. (*Id.* at 345)

Snider resumed treatment with Dr. Javed in March 2016 and did not return to Dr. Hosny. (*See id.* at 388–90) Dr. Javed expressed concern regarding Snider's understanding about how to

3

take her prescribed medications and her ability to comprehend the negative side effects of failing to take those medications correctly. (*Id.* at 390) In May 2016, Dr. Javed prescribed Orencia. (*Id.* at 392) In August 2016, Dr. Javed prescribed Paxil to treat Snider's anxiety. (*Id.* at 556)

Dr. Javed continued to treat Snider in 2017 and 2018. (*Id.* at 602–17) In November 2017, Snider reported worsening leg pains. (*Id.* at 609–10) In April 2018, Snider complained of joint pain in her hands, shoulders, knees, and feet and swelling in her hands, wrists, knees, and feet. (*Id.* at 613) Dr. Javed observed synovitis in both hands, effusion in both knees, and soft tissue swelling in the ankles. (*Id.*) Dr. Javed prescribed Enbrel and ordered Snider to continue with previously prescribed medications. (*Id.* at 614)

## 2. Orthopedics

In December 2016, Snider was treated by Heather Gotha, M.D. ("Dr. Gotha") for chronic left ankle pain. (*Id.* at 639) Snider reported that her foot had started to turn "in" and "downwards" about a year before the appointment, which caused difficulty walking. (*Id.*) After ordering and reviewing X-rays of Snider's left ankle and foot, Dr. Gotha noted that Snider had "a foot drop with severe peroneal tendon weakness." (*Id.*) Dr. Gotha ordered an EMG and MRI and prescribed a "posterior shell AFO" (a brace) to help Snider walk. (*Id.*) In April 2017, Dr. Gotha reviewed the results of Snider's MRI with her. (*Id.* at 642) The MRI "showed chronic tendinopathy and tenosynovium synovitis of both peroneus longus and brevis tendons with a large longitudinal tear of the peroneus brevis." (*Id.*) In August 2017, Dr. Gotha reviewed the results of Snider's EMG with her. (*Id.* at 644) The EMG "revealed abnormal muscle signal and activity involving the tibialis anterior and posterior tibial tendons." (*Id.*) Dr. Gotha referred Snider to a physical therapist for "gait training and strengthening" and a neurologist for an evaluation. (*Id.*)

4

In September 2017, Snider began physical therapy at ATI Physical Therapy. (*Id.* at 575) Her physical therapist observed Snider's slow gait. (*Id.*) Snider told her physical therapist that she occasionally used a cane, but otherwise just went slowly. (*Id.*) After eight physical therapy sessions, Snider took a brief pause to consult with a neurologist. (*Id.* at 590) Snider resumed physical therapy on November 9, 2017, and went on to have six more treatment sessions. (*Id.* at 592–601) Snider was discharged from physical therapy on December 7, 2017, having made minimal gains. (*Id.* at 599) Her physical therapist noted that Snider continued to have difficulty walking and had pain and weakness in her knees and ankles. (*Id.*)

### 3. Neurology

Snider first consulted with neurologist Alison L. Potter, D.O. ("Dr. Potter") on October 25, 2017. (*Id.* at 615–18) Dr. Potter observed that Snider had a "spastic gait," pain in response to strength testing in her upper and lower extremities, and increased tone in her left lower extremity, among other things. (*Id.* at 616–17) Dr. Potter ordered testing for stiff person syndrome ("SPS"),[3] prescribed baclofen, and instructed Snider to continue physical therapy. (*Id.* at 617–18) An MRI of Snider's lumbar spine revealed "[m]ild spondylosis at L3-S1 level, and moderate . . . right ventral epidural soft tissue at the S1 level likely represented sequestered disc material extending from L5-S1, and less likely neoplasm such as hemangioma or peripheral nerve tumor (schwannoma), encroaching on the transversing right S1 nerve root within the lateral recess." (*Id.* at 619) An MRI of Snider's brain revealed "mild non specific white matter

---

[3] "Stiff person syndrome (SPS) is a very rare disease affecting only one or two people per million. It causes progressive muscle stiffness and painful spasms that can be triggered by a variety of things including sudden movement, cold temperature or unexpected loud noises." Johns Hopkins | Neurology & Neurosurgery: Stiff Person Syndrome, https://www.hopkinsmedicine.org /neurology_neurosurgery/centers_clinics/stiff-person-syndrome/conditions-we-treat.html (last visited July 21, 2021).

changes." (*Id.* at 623) On December 8, 2017, Dr. Potter diagnosed Snider with SPS, prescribed Valium, and ordered a follow up MRI of her lumber spine. (*Id.* at 623–24) A January 26, 2018 MRI showed a redemonstration of the "focal lesion demonstrating avid enhancement in the right ventral epidural space at the S1 level abutting the medial aspect of the transversing right S1 nerve root without associated displacement most likely representing a hemangioma."[4] (*Id.* at 628) During an appointment on February 2, 2018, Dr. Potter noted that Snider was "tearful at times" and counseled Snider about her diagnosis and treatment options. (*Id.* at 631–33) Dr. Potter also referred Snider to doctors at Johns Hopkins for further treatment. (*Id.* at 632, 635–37)

### 4. Mental Health

On August 23, 2016, Snider was treated by Miles Leon, LCSW ("Leon") at Mid-Atlantic Behavioral Health Chapel. (*Id.* at 648–49) Snider complained that as the pain from her severe rheumatoid arthritis had gotten worse her anxiety had also gotten worse. (*Id.* at 648) Snider reported having difficulty concentrating, excessive worry, and feeling tired or without energy. (*Id.*) Leon found Snider to be "somewhat cooperative" and "guarded," noted that she appeared to be "acutely ill in moderate distress," and described her mood as "anxious" and "unhappy." (*Id.* at 648–49) Leon diagnosed Snider with adjustment disorder with anxiety. (*Id.* at 649) On September 12, 2016, Snider was treated by Michelle Dolcar, LPCMH ("Dolcar") at Mid-Atlantic Behavioral Health Chapel. (*Id.* at 650–652) Dolcar described Snider's mood as "anxious" and "sad" and her affect as "blunted." (*Id.* at 650) Dolcar diagnosed Snider with adjustment disorder

---

[4] "Spinal hemangiomas are benign tumors that are most commonly seen in the mid-back (thoracic) and lower back (lumbar)." UPMC, Spinal Hemangioma, https://www.upmc.com/services/neurosurgery/spine/conditions/tumors-lesions/hemangioma (last accessed July 21, 2021).

6

with mixed anxiety and depressed mood. (*Id.* at 651)

On October 10, 2016, Snider was treated by Mike Considine, Psy. D., LPCMH ("Dr. Considine"), also at Mid-Atlantic Behavioral Health Chapel. (*Id.* at 653–54) Snider told Dr. Considine that "things [were] out of control" and "not going to go well." (*Id.* at 653) Dr. Considine stated that Snider's mood was "anxious" and "sad" and that her affect was "blunted." (*Id.*) He also noted that Snider's "[c]apacity for sustained mental activity and abstract thinking" was "within normal limits." (*Id.*) Dr. Considine diagnosed Snider with major depressive disorder. (*Id.* at 654)

Snider did not treat with any mental health providers again until she visited Dr. Considine on March 6, 2018. (*Id.* at 655–56) During several appointments in March and April of 2018, Dr. Considine described Snider as "somewhat cooperative" and "guarded," noted that she "appear[ed] acutely ill in moderate distress," and diagnosed her with adjustment disorder with mixed anxiety and depressed mood and major depressive disorder. (*Id.* at 657–63)

## 5. Primary Care Physician

Snider visited regularly with her primary care physician, Alfred Fletcher, M.D. ("Dr. Fletcher"). (*Id.* at 353–79, 435–78, 571, 668–84) In August 2015, Dr. Fletcher noted Snider had severe swelling and pain in her left ankle and pain in her lower back. (*Id.* at 364–66) In January 2016, Snider reported ongoing lower back pain and muscle spasms. (*Id.* at 361–63) In March 2016, Snider reported having pain in her hands at an intensity rating of "10." (*Id.* at 357–59) In June 2016, Snider continued to report experiencing low back pain, fatigue, and shortness of breath, and Dr. Fletcher prescribed additional medications to treat her symptoms. (*Id.* at 435–37, 451) In August 2016, Snider reported low back pain, swelling in her hands and wrists, mid back pain, unsteady walking, extreme fatigue, and shortness of breath. (*Id.* at 474–75) Dr. Fletcher

7

observed muscle spasms, joint tenderness, and swelling, and prescribed additional medication for these symptoms. (*Id.*) During each of Snider's visits to Dr. Fletcher, he consistently recommended that she continue to follow up with her rheumatologists and follow their recommended treatment plan. (*See id.* at 359, 363, 366, 436–37, 475)

In July 2017, Snider saw Dr. Fletcher and reported migratory joint pains, difficulty with walking, and trouble sitting for long periods. (*Id.* at 671–73) He recommended that she continue with her medication and follow up with Dr. Javed. (*Id.* at 673) During a visit in November 2017, Dr. Fletcher noted that Snider had swelling in her knee, ankle tenderness and swelling, and observed that she was in moderate stress due to her left knee, leg, and ankle pain. (*Id.* at 679) In February 2018, after being diagnosed with SPS by Dr. Potter, Dr. Fletcher prescribed a four-point cane for Snider to use. (*Id.* at 571, 623–24)

## 6. Medical Opinions

On August 24, 2016, August 17, 2017, and May 21, 2018, Dr. Javed completed RFC questionnaires for Snider, stating that Snider had work-preclusive limitations and that her anxiety and depression increased her pain and reduced her functionality. (*Id.* at 497–503, 561–66, 685–90)

On August 5, 2016, Dr. Fletcher completed a Medical Source Statement, noting Snider's restrictions with lifting, standing, sitting, reaching, handling, and fingering in light of her chronic pain due to her rheumatoid arthritis and opining that Snider was not capable of performing sedentary or light work for eight hours per day. (*Id.* at 494–96) On July 21, 2017, Dr. Fletcher completed another Medical Source Statement, reaffirming his opinion that Snider could not perform sedentary or light work for eight hours per day and noting that Snider needed to sit with her feet elevated for ten minutes every hour due to the swelling in her ankles. (*Id.* at 557–58)

8

On May 1, 2018, Dr. Considine completed a psychological functional capacity assessment for Snider. (*Id.* at 664–66)  Dr. Considine acknowledged that he had not formally assessed Snider and that much of the assessment form seemed to be related to medical issues. (*Id.* at 666)  However, Dr. Considine characterized Snider's limitations due to her anxiety and depression as "severe" in the following areas: daily activities, ability to sustain work performance and attendance in a normal work setting, and ability to cope with the pressures of ordinary work. (*Id.* at 664–66)  In addition, Dr. Considine characterized Snider's limitations in these other areas as "moderate severe": ability to relate to people; ability to carry out instructions; and ability to perform routine, repetitive tasks. (*Id.*)

On May 23, 2018, physical therapist Jeffrey Vari conducted a physical capacity evaluation of Snider. (*Id.* at 698–708)  Mr. Vari noted that Snider ambulated with a significant gait change, including a stiff knee and ankle on the left side and heavy reliance on a single point cane. (*Id.* at 701)  Mr. Vari concluded that Snider could perform four hours of sedentary work per day. (*Id.* at 699)  Drs. Javed and Fletcher subsequently agreed with Mr. Vari's findings. (*Id.* at 717, 729)

Lastly, on May 31, 2018, Dr. Potter completed a Medical Source Statement, concluding that Snider could perform less than two hours of sedentary work per day. (*Id.* at 691)

### 7. State Agency Reviews

On June 30, 2016, after reviewing most of Snider's records,[5] Carlene Tucker-Okine, Ph. D. ("Dr. Tucker-Okine"), opined that Snider's mental impairment was not severe and that her anxiety caused mild restrictions of her activities of daily living, mild difficulties in maintaining

---

[5] Dr. Tucker-Okine did not review records from Leon or Dr. Considine at Mid-Atlantic Behavior Health. (*See* D.I. 8 at 79–81)

9

social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (*Id.* at 79–81) On November 7, 2016, Dianne Bingham, Ph. D. ("Dr. Bingham") reviewed Dr. Tucker-Okine's findings and affirmed them. (*Id.* at 95)

## C. Hearing Before ALJ Penca

### 1. Snider's Testimony[6]

Snider testified that she was working part-time as a medical receptionist. (*Id.* at 58–59) She explained that she worked two days per week, four hours one day and six and half hours the next day. (*Id.* at 58–59) She testified that should could not do this work full-time because of her chronic fatigue due to her rheumatoid arthritis, muscle spasms on her left side, symptoms related to SPS, swelling and pain in her joints and muscles, and her need to elevate her left leg on an ongoing basis. (*Id.* at 59–60) Snider also testified that she used a quad cane that was prescribed to her by Dr. Fletcher after she had experienced multiple falls. (*Id.* at 60–61) Snider also testified to wearing orthotics on her left knee to help her walk and on her left ankle to help with the swelling. (*Id.* at 61) In addition, she struggled to maintain pace in her work as a result of her illnesses, which led to multiple employment terminations. (*Id.* at 61–62)

Snider also testified that she was being treated for depression by Dr. Considine. (*Id.* at 64) Snider saw Dr. Considine every two weeks initially, but then only on an as needed basis. (*Id.*) Snider also testified that her physical impairments caused her emotional stress. (*Id.* at 66–67)

---

[6] In addition to her live testimony at the hearing, Snider submitted a written function report for the ALJ's review. (*See* D.I. 8 at 253–60)

10

## 2. Vocational Expert Testimony Before the ALJ

The ALJ posed the following hypothetical to the vocational expert Adina Leviton ("the

VE"):

> I'd like you to assume an individual claimant's age, education, and work history
> who can perform work at the light exertional level, who could occasionally climb
> ramps and stairs, but never ladders, ropes, and scaffolds[,] [w]ho could
> occasionally balance, stoop, kneel, crouch, and crawl[,] [w]ho could occasionally
> reach overhead with both arms[,] [w]ho can frequently push, pull, handle, and
> finger with both arms[,] [w]ho can frequently push and pull with both legs, and
> who could have occasional exposure to extreme cold, extreme heat, wetness,
> humidity, vibration, fumes, odors, dusts, gas, poor ventilation, and hazards.
> Could this individual perform any of the claimant's past work?

(*Id.* at 70) In response to the ALJ's hypothetical, the VE testified that such a hypothetical

individual would be able to perform Snider's past work as a medical receptionist or as a fraud

investigator. (*Id.* at 69–70) The ALJ then modified the hypothetical to include an additional

limitation: only sedentary jobs. (*Id.*) In response, the VE testified again that such a hypothetical

individual would be able perform Snider's past relevant work. (*Id.*) The ALJ again modified the

hypothetical to include the condition that the individual would be off task 15 percent of the

workday due to pain and other factors. (*Id.* at 70–71) The VE testified that there would be no

work available for an individual who would be off task for that amount of time. (*Id.* at 71)

### D. The ALJ's Findings

Based on the factual evidence in the record and the testimony by Snider and the VE, the

ALJ determined that Snider was not disabled under the Act for the relevant time period from July

31, 2015 through August 20, 2018, the date of the ALJ's decision. (*Id.* at 20) The ALJ found, in

pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act
   through June 30, 2022.

2. The claimant has not engaged in substantial gainful activity since July 31,

11

2015, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease, rheumatoid arthritis, stiff person syndrome, asthma, and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5. [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can only occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; occasionally reach overhead with the bilateral upper extremities; frequently push, pull, handle, and finger with the bilateral upper extremities; frequently push and pull with the bilateral lower extremities; and have occasional exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dust, gases, poor ventilation, and hazards.

6. The claimant is capable of performing past relevant work as a medical receptionist and fraud investigator. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565)

7. The claimant has not been under a disability, as defined in the Social Security Act, from July 31, 2015, through the date of this decision (20 CFR 404.1520(f)).

(*Id.* at 12–20)

## III. STANDARD OF REVIEW

Judicial review of the ALJ's decision is limited to determining whether substantial evidence supports the decision. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "Substantial evidence means enough relevant evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Pearson v. Comm'r of Soc. Sec.*, 2020 WL 7054447, at *2 (3d Cir. Dec. 2, 2020) (quoting *Biestek*, 139 S.Ct. at 1154). When applying the substantial evidence standard, the court "looks to an existing administrative record and asks

12

whether it contains 'sufficien[t] evidence' to support the agency's factual determinations."
*Biestek*, 139 S. Ct. at 1154 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).
The threshold for satisfying the substantial evidence standard is "not high[,]" requiring "more
than a mere scintilla" of evidence. *Id.*

## IV.   DISCUSSION

### A.   Disability Determination Process

Title II of the Act affords insurance benefits to people who contributed to the program
and who have a disability. *See Pearson*, 2020 WL 7054447, at *2 (citing 42 U.S.C. § 423(a)(1)).
A disability is the "inability to engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be expected to result in death
or which has lasted or can be expected to last for a continuous period of not less than 12
months." 42 U.S.C. § 423(d)(1)(A). A claimant is only disabled if his impairments are so severe
that he is unable to do his previous work or engage in any other kind of substantial gainful work
existing in the national economy. *Id.* § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21–22
(2003). To qualify for disability insurance benefits, a claimant must establish that he was
disabled prior to the date he was last insured. 20 C.F.R. § 404.131 (2016); *Zirnsak v. Colvin*,
777 F.3d 607, 611–12 (3d Cir. 2014).

The Commissioner must perform a five-step analysis to determine whether a person is
disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir.
1999). If the Commissioner makes a finding of disability or non-disability at any point in the
sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§
404.1520(a)(4), 416.920(a)(4). At step one, the Commissioner determines whether the claimant
is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If

13

the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC "measures the most she can do despite her limitations." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)) (internal quotations and alterations omitted). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether

14

he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

## B. Whether the ALJ's Decision is Supported by Substantial Evidence

### 1. Step Two: Severity of Mental Impairments

First, Snider argues the ALJ's finding at step two, that her depression, adjustment disorder, and anxiety were not severe, is not supported by substantial evidence. (D.I. 15 at 12) Snider argues the ALJ erred in the following respects: (1) failure to consider Snider's complete mental examinations; (2) reliance on outdated state agency opinions by consultants who had not reviewed Snider's mental health treatment records; (3) discounting Snider's written testimony; and (4) failing to consider the cumulative effect of Snider's mental impairments with her physical pain and fatigue. (*Id.* at 12–16) In response, the Commissioner argues the ALJ's decision was supported by substantial evidence and that Snider's argument calls for the court to impermissibly reweigh the evidence. (D.I. 18 at 14)

In evaluating the severity of Snider's mental impairment due to depression and anxiety, the ALJ considered the four areas of mental functioning known as the "paragraph B" criteria: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. (D.I. 8 at 13–14) (citing 20 C.F.R., Part 404, Subpart P and Appendix 1). The ALJ concluded that Snider had a "mild limitation" in all of these areas and, as a result, concluded that her mental impairment was not severe. (*See id.*) (citing 20 C.F.R. § 404.1520a(d)(1)) In support of this decision, the ALJ gave great weight to the opinions of state agency consultants. (*Id.* at 14) The state agency consultants issued their opinions in June and November 2016, and noted that their opinions were based on the evidence that they had reviewed up until that point. (*Id.* at 80–81,

95–96) The consultants noted that Snider was not prescribed any mediations or receiving mental health treatment at the time they considered her case. (*See id.*)

Later submitted evidence, as the ALJ noted, shows that Snider was prescribed Paxil to treat her anxiety in 2016 by Dr. Javed. (*Id.* at 13, 552–56) In addition, Dr. Potter reported that Snider was in moderate distress and was tearful at times during her examination in February 2018. (*Id.* at 631) Snider's therapists at MidAtlantic Behavioral Health, Leon, Dolcar and Considine, made similar observations during their mental status examinations of Snider. (*Id.* at 648–663) For example, on August 23, 2016, Leon acknowledged that Snider seemed oriented to time and place, but noted that she was anxious, unhappy, and appeared to be "acutely ill in moderate distress." (*Id.* at 648) None of these records were reviewed by the state agency consultants, nor did the ALJ reference them or explain why he rejected them at step two of his decision.[7] (*See id.* at 13–14, 79–81, 95–96)

In addition, Snider submitted written testimony in which she said that she had difficulty engaging socially due to her fatigue and physical inabilities and frequently had trouble completing tasks as a result of her pain. (*Id.* at 258) Snider also stated that the handled stress "minimally" depending on her level of pain. (*Id.* at 259) However, the ALJ failed to mention Snider's statements or explain why he rejected them. Therefore, the court finds that the severity finding at step two related to Snider's mental impairment was not supported by substantial evidence. *See Rudy v. Berryhill*, 2017 WL 1283911, at *7–8 (M.D. Pa. Apr. 6, 2017) (remanding where the ALJ did not review evidence relevant to the severity of the conditions

---

[7] The ALJ explained why he rejected Considine's psychological functional capacity report dated May 1, 2018 (D.I. 8 at 14 (citing Exhibit 26F) (noting Considine's failure to explain his opinion and his admission that he had not formally assessed Snider), but not Snider's other mental health providers or other evidence in the record related to Considine. (*See* D.I. 8 at 13–14)

16

found to be non-severe at step two, which supported a greater severity finding); *see also Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) ("The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects.").

The ALJ's failure to consider such evidence is not harmless because he did not consider the limitations related to Snider's adjustment disorder, depression, or anxiety in making his RFC determination. (D.I. 8 at 15–19) Therefore, the court recommends remanding the case for further analysis consistent with this Report and Recommendation. *See Rudy*, 2017 WL 1283911 at *8 (holding that a step two severity error was not "harmless because limitations related to some conditions found non-severe were not included in the RFC").

## 2. The ALJ's RFC Determination

Snider also argues that, in making an RFC determination, the ALJ erred in failing to consider the following credibly established limitations: (1) Snider's overall inability to sustain work; (2) her mental limitations; and (3) her need to use a cane to ambulate and balance. (D.I. 15 at 16–17; D.I. 20 at 5–8)

### a. Ability to Sustain Work

In making an RFC determination, the ALJ must "assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's RFC] for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184 at *1. Snider argues the ALJ failed to consider her need to frequently attend medical appointments and whether such appointments would impact her ability to sustain work. (D.I. 18–19; D.I. 20 at 7–8) The Commissioner argues that the adverse impact from Snider's need to attend medical appointments is not factually

17

supported in the record. (D.I. 18 at 21 n.5) The record shows that Snider had 34 medical appointments from August 2017 through February 2018. (D.I. 8 at 325–27) However, the ALJ did not consider whether Snider's need to attend medical appointments would impact her ability to sustain work or pose a hypothetical to the VE including such a condition. (*Id.* at 17–19, 69–71) Therefore, the court recommends remanding this case for the ALJ to consider whether Snider's absence from work to attend medical appointments would impact her ability to perform work on a regular and continuing basis. *See Kangas v. Bowen*, 823 F.2d 775, 778 (3d Cir. 1987) (remanding where "the ALJ . . . failed to evaluate the effect of [the claimant's] frequent hospitalizations on his ability to perform any work on a regular, continuing or sustained basis").

#### b. **Mental Health**

"When creating an RFC assessment and formulating the hypothetical for the VE, the ALJ must include *all* of a claimant's limitations stemming from medically supported impairments, whether or not those impairments are severe." *Harmon v. Astrue*, 2012 WL 94617, at \*2 (E.D. Pa. Jan. 11, 2012) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005)). As discussed above, the ALJ noted that Snider had medically determinable anxiety, adjustment disorder, and depression, but he concluded that Snider's mental impairment was mild in each of the four paragraph B categories. (D.I. 8 at 13–14) However, the ALJ never questioned the VE about whether a hypothetical individual with such mild limitations would be able to perform Snider's past relevant semi-skilled and skilled work. (*Id.* at 69–71) Because the ALJ found that Snider's non-severe anxiety, adjustment disorder, and depression were medically supported, and because he acknowledged mild limitations in connection with her anxiety, adjustment disorder, and depression, "the ALJ had a duty to address those limitations in the RFC assessment and the hypothetical question posed to the VE." *Moore v. Colvin*, 239 F. Supp. 3d 845, 860 (D. Del.

18

2017). As was the case in *Moore*, the ALJ's failure to analyze her mild mental limitations was particularly important in light of the ALJ's conclusion that Snider could perform her semi-skilled and skilled past relevant work. *Id.* at 861 (quoting *Harmon v. Astrue*, 2012 WL 94617, at \*2 (E.D. Pa. Jan 11, 2012) ("Courts have found that 'even minimal deficits in these areas of functioning could impact [a plaintiff's] ability to successfully perform the [skilled] occupation.'").

The ALJ's failure to include all of the limitations he found to be associated with Snider's medically determinable anxiety, adjustment disorder, and depression in making an RFC assessment and in the hypothetical posed to the VE constitutes legal error. *Layfield v. Colvin*, 2016 WL 4578327, at \*14 (D. Del. Sept. 1, 2016), *report and recommendation adopted*, 2016 WL 5213902 (D. Del. Sept. 20, 2016). Therefore, the court recommends remanding this case to allow the allow the ALJ to reconsider any such limitations stemming from Snider's medically determinable anxiety, adjustment disorder, and depression, and to include such limitations in the hypothetical posed to a VE.

### c. Use of a Cane

For the ALJ "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at \*7. Dr. Fletcher prescribed Snider a four-point cane and noted that she used it for standing and walking. (D.I. 8 at 571, 693) Nevertheless, the ALJ determined that Snider had the RFC to perform sedentary work. (D.I. 8 at 15–19) The ALJ referenced Snider's use of a cane in his decision, but he did not provide a related limitation in the

19

hypothetical posed to the VE. (*Id.* at 15–16) Nor did the ALJ provide an explanation as to why Snider's use of a cane was rejected. (*Id.* at 15–19) For this reason also, the case must be remanded for further consideration of the evidence that Snider needs and uses a cane and whether such a need would impact her capacity to work. *See Graver v. Colvin*, 2014 WL 1746976, at (M.D. Pa. May 1, 2014) (remanding where "the ALJ provided no reason for not including the cane in his RFC or in his question to the Vocational Expert"); *cf. Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) ("Even if the ALJ erred regarding the cane, though, any error was harmless as he asked the vocational expert to take the cane into account and there were still jobs available that appellant could perform.").

## V.    CONCLUSION

For the foregoing reasons, I recommend that the court grant Snider's motion for summary judgment (D.I. 14), and deny the Commissioner's cross-motion for summary judgment (D.I. 17). I further recommend that the court remand the case to the Commissioner with instructions to:

1) Consider the credible evidence in the complete record from all of Snider's medical providers in determining the severity of her mental health impairments;

2) Include in the RFC assessment the limitations stemming from Snider's medically determinable anxiety, adjustment disorder, and depression;

3) Include in the RFC assessment whether Snider's attendance at medical appointments would impact her ability to sustain work;

4) Include in the RFC assessment the credible evidence that Snider was prescribed and uses a cane and whether it impacts her ability to work;

5) Address all of the foregoing limitations in the hypothetical question posed to the VE; and

6) Re-assess Snider's RFC and her ability to return to past relevant work.

20

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006*)*; *Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: July 22, 2021

Sherry R. Fallon
United States Magistrate Judge